# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWIN MUNIZ, Derivatively on Behalf of BLUE OWL CAPITAL INC.<br><br>Plaintiff,<br><br>    v.<br><br>DOUGLAS I. OSTROVER, MARC S. LIPSCHULTZ, ALAN KIRSHENBAUM, CRAIG W. PACKER, MICHAEL REES, MARC ZAHR, JENNIFER BROUSE, CLAUDIA HOLZ, STACY POLLEY, ANDREW S. KOMAROFF, and DANA WEEKS,<br><br>          Defendants,<br><br> and,<br><br>BLUE OWL CAPITAL INC.<br><br>       Nominal Defendant. | Case No:<br><br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Edwin Muniz ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf Blue Owl Capital Inc. ("Blue Owl" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

## JURISDICTION

2.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.    This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in

numerous activities that had an effect in this District; and (iv) defendants have otherwise purposefully availed themselves of this District through issuing false statements in this District.

5.      In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

**Plaintiff**

6.      Plaintiff is, and was at relevant times, a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff holds 20,000 shares of Blue Owl stock.

**Nominal Defendant**

7.      *Nominal Defendant Blue Owl* is incorporated under the laws of Delaware with its principal executive offices located in New York, New York. Blue Owl's Class A common stock trades on the New York Stock Exchange ("NYSE") under the symbol "OWL."

**Director Defendants**

8.      *Defendant Douglas I. Ostrover* ("Ostrover") has served as the Company's Co-Chief Executive Officer ("Co-CEO") and Chairman at all relevant times.

9.      *Defendant Marc S. Lipschultz* ("Lipschultz") has served as the Company's Co-CEO and director at all relevant times.

10.      *Defendant Craig W. Packer* ("Packer") has served as a director of the Company at all relevant times.

11.    **Defendant Michael Rees** ("Rees") has served as a director of the Company at all relevant times.

12.    **Defendant Marc Zahr** ("Zahr") has served as a director of the Company at all relevant times.

13.    **Defendant Jennifer Brouse** ("Brouse") has served as a director of the Company at all relevant times.

14.    **Defendant Claudia Holz** ("Moore") has served as a director of the Company at all relevant times. She also serves as the Chair of the Audit Committee.

15.    **Defendant Stacy Polley** ("Polley") has served as a director of the Company at all relevant times. She also serves as a member of the Audit Committee.

16.    **Defendant Andrew S. Komaroff** ("Kamaroff") has served as a director of the Company at all relevant times.

17.    **Defendant Dana Weeks** ("Weeks") has served as a director of the Company at all relevant times. She also serves as a member of the Audit Committee.

18.    The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

19.    **Defendant Alan Kirshenbaum** ("Kirshenbaum") was the Company's Chief Financial Officer ("CFO") at all relevant times.

20.    Defendant Kirshenbaum together with Defendants Ostrover and Lipschultz are collectively referred to herein as the "Officer Defendants."

21.    The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22.    Blue Owl is an asset management firm which specializes in alternative investment solutions, primarily private credit. It has three major product platforms: (i) Credit, (ii) GP Strategic Capital, and (iii) Real Assets.

23.    Within Credit, Blue Owl offers direct lending, alternative credit, investment grade credit, liquid credit, and other private financing solutions. As of fiscal 2024, the Company had over $251 billion in assets under management, 40% of which was part of the Company's Direct Lending business.

24.    Blue Owl reports certain key financial metrics. Assets under management ("AUM") is the sum of net asset value, debt, uncalled capital commitments, total managed assets for certain credit and real asset products, and par value of collateral for collateralized loan obligations and other securitizations. Fee-paying AUM ("FPAUM") is the management fees earned and, for BDCs,[1] generally equals the total assets (including assets acquired with debt but excluding cash). "Part I Fees," or management fees, refers to quarterly performance income on the net investment income of BDCs, subject to a fixed hurdle rate. "Part II Fees," or performance revenues, are fees from BDCs that are paid in arrears at the end of each measurement period.

25.    Private credit (or "direct lending") is when non-banking entities make private loans to businesses. Whereas loans through financial institutions are funded by customer deposits, private credit loans are funded by money raised from private investors. Investors in private credit funds can then earn income based on the fees and interest payments paid on the portfolio of loans. Private credit loans are typically made to middle market companies, and often for more high-risk

---

[1]    Business development companies ("BDCs").

investments. While a bank would normally be required to ensure investors are protected against the risk of default for a high-risk investment, a private credit fund is not. Private credit firms do not have to build up capital that can absorb losses if a loan defaults, nor even disclose the risk on their books.

26.     There are multiple vehicles for investing in private credit. Traditional direct private credit fund investments often involve long lock-up periods and large minimum investment requirements. As such, they have historically been the domain of large, institutional investors. Investors can access the private loan market through business development companies ("BDCs"). Unlike private credit funds, BDCs are SEC registered investment vehicles that can be publicly traded and, as a result, they are generally more liquid.

27.     Blue Owl manages a number of BDCs, including OBDC and OBDC II. OBDC trades on the New York Stock Exchange under the symbol "OBDC." OBDC's price fluctuates, but in general, it trades at a value equivalent to roughly 80% of its net asset value.

28.     OBDC II is not publicly traded. To ensure investors can access their capital, OBDC II offers quarterly tender offers, where shareholders can sell shares back to the Company at a price equivalent to the fund's current net asset value. OBDC II has consistently made quarterly tender offers for the previous seven (7) years.

29.     Throughout fiscal year 2025, OBDC II experienced a rapid increase in the number of shares investors repurchased. For example, in the prior year 2024, OBDC II's August-September quarterly redemption saw 3,785,909 shares repurchased. In 2025, OBDC II's August-September quarterly redemption nearly doubled, with 7,138,809 shares repurchased. In total, investors in OBDC II pulled $150 million from the fund through the first nine (9) months of 2025, a 20% increase from this time last year, according to securities filings. Despite this, the Individual

Defendants misleadingly claimed that there was "no meaningful pressure to our asset base from redemptions," as alleged herein.

### MATERIALLY FALSE AND MISLEADING STATEMENTS

30.    On February 6, 2025, Blue Owl published financial results for the quarter ended December 31, 2024 in an investor presentation, simultaneously published with the SEC on a Form 8-K as Exhibit 99.2. The investor presentation purported to report the Company's financial results, GAAP historical trends, the performance of the Company's credit platform, and the Company's liquidity. Specifically, the investor presentation stated as follows:

**Financial Results**
- **GAAP Net Income** of $20.7 million, or $0.03 per basic and $0.03 per diluted Class A Share
- **Fee-Related Earnings** of $340.3 million, or $0.23 per Adjusted Share
- **Distributable Earnings** of $315.2 million, or $0.21 per Adjusted Share

**Capital Metrics**
- **AUM** of $251.1 billion, up 52% since December 31, 2023
  - **FPAUM** of $159.8 billion, up 56% since December 31, 2023
  - **Permanent Capital** of $191.5 billion, up 47% since December 31, 2023
  - **AUM Not Yet Paying Fees** of $22.6 billion, reflecting expected annual management fees of over $300 million once deployed
- **New Capital Commitments Raised** of $18.1 billion ($9.5 billion new equity capital) in the quarter
- **FPAUM Raised and Deployed** of $9.2 billion in the quarter

## Historical Trends (GAAP)

- **GAAP Management Fees** of $1,994.1 million for the year, increased 31% compared to prior year
- **GAAP Consolidated Net Income** of $420.4 million for the year, compared to $220.8 million in the prior year
- **GAAP Net Income Attributable to Class A Shares** of $109.6 million for the year, compared to $54.3 million in the prior year

## Credit Platform

- **AUM** of $135.7 billion, increased 60% since December 31, 2023
  - The increase was primarily driven by the Kuvare and Atalaya Acquisitions, as well as capital raised and change in debt in products from the direct lending strategy.
- **FPAUM** of $91.0 billion, increased 59% since December 31, 2023
  - The increase was primarily driven by the Kuvare and Atalaya Acquisitions, as well as capital raised in products from the direct lending strategy and deployment across the platform
- **Direct Originations** during the quarter were $13.4 billion with net deployment of $2.1 billion
  - Direct Originations for the year were $52.0 billion with net deployment of $16.6 billion
- **AUM Not Yet Paying Fees** totaled $16.4 billion, reflecting expected annual management fees of $238 million once deployed
- **Direct Lending Gross Returns**[1] of 3.1% for 4Q'24 and 13.9% for 2024

## Supplemental Liquidity Metrics

As of December 31, 2024, the average maturity of the Company's outstanding notes is ~10 years.



31.     On February 21, 2025, the Company submitted its annual report for the fiscal year ended December 31, 2024 on a Form 10-K filed with the SEC (the "FY24 10-K"). The FY24 10-K affirmed the previously reported financial results and reported financial metrics for each of the BDCs. The FY24 10-K stated:

| (dollars in millions) | Year of Inception | AUM | Capital Raised (4) | Invested Capital (5) | Realized Proceeds (6) | Unrealized Value (7) | Total Value | MoIC Gross (8) | MoIC Net (9) | IRR Gross (10) | IRR Net (11) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Direct Lending** | | | | | | | | | | | |
| Blue Owl Capital Corporation (1) | 2016 | $ 15,625 | $ 5,977 | $ 5,977 | $ 3,536 | $ 5,972 | $ 9,508 | 1.84x | 1.59x | 13.7 % | 9.8 % |
| Blue Owl Capital Corporation II (1)(2) | 2017 | $ 2,522 | $ 1,206 | $ 1,176 | $ 530 | $ 1,153 | $ 1,683 | NM | 1.43x | NM | 7.4 % |
| Blue Owl Capital Corporation III (1) | 2020 | $ 4,812 | $ 1,845 | $ 1,842 | $ 606 | $ 1,909 | $ 2,515 | 1.43x | 1.37x | 13.9 % | 12.0 % |
| Blue Owl Credit Income Corp. (1)(2) | 2020 | $ 28,636 | $ 13,944 | $ 12,907 | $ 1,872 | $ 13,205 | $ 15,077 | NM | 1.17x | NM | 11.2 % |
| Blue Owl Technology Finance Corp. (1) | 2018 | $ 7,403 | $ 3,372 | $ 3,372 | $ 970 | $ 3,608 | $ 4,578 | 1.45x | 1.36x | 11.8 % | 9.1 % |
| Blue Owl Technology Finance Corp. II (1) | 2021 | $ 8,207 | $ 4,178 | $ 2,623 | $ 303 | $ 2,736 | $ 3,039 | 1.22x | 1.16x | 16.5 % | 11.7 % |
| Blue Owl Technology Income Corp. (1)(2) | 2022 | $ 6,071 | $ 3,131 | $ 2,840 | $ 357 | $ 2,904 | $ 3,261 | NM | 1.15x | NM | 11.6 % |
| Blue Owl First Lien Fund Levered (3) | 2018 | $ 1,419 | $ 986 | $ 912 | $ 590 | $ 647 | $ 1,237 | 1.44x | 1.36x | 10.2 % | 8.3 % |
| Blue Owl First Lien Fund Unlevered (3) | 2019 | $ 68 | $ 175 | $ 156 | $ 122 | $ 68 | $ 190 | 1.27x | 1.22x | 6.4 % | 5.2 % |

32.    The FY24 10-K also reported AUM, Part I Fees, and Part II Fees. Specifically, the FY24 10-K states, in relevant part:

*Year Ended December 31, 2024, Compared to the Year Ended December 31, 2023*

| (dollars in thousands) | | Year Ended December 31, | | $ Change |
|---|---|---|---|---|
| | | 2024 | 2023 | |
| **Revenues** | | | | |
| Management fees, net (includes Part I Fees of $527,859 and $387,346) | $ | 1,994,064 | $ 1,527,241 | $ 466,823 |
| Administrative, transaction and other fees | | 294,267 | 200,746 | 93,521 |
| Performance revenues | | 7,096 | 3,621 | 3,475 |
| **Total Revenues, Net** | | **2,295,427** | **1,731,608** | **563,819** |
| **Expenses** | | | | |
| Compensation and benefits | | 1,017,483 | 870,642 | 146,841 |
| Amortization of intangible assets | | 258,256 | 300,341 | (42,085) |
| General, administrative and other expenses | | 412,931 | 242,809 | 170,122 |
| **Total Expenses** | | **1,688,670** | **1,413,792** | **274,878** |
| **Other Loss** | | | | |
| Net gains (losses) on investments | | 1,713 | 4,203 | (2,490) |
| Interest and dividend income | | 42,172 | 22,176 | 19,996 |
| Interest expense | | (121,894) | (75,696) | (46,198) |
| Change in TRA liability | | 7,080 | (1,656) | 8,736 |
| Change in warrant liability | | (38,300) | (14,050) | (24,250) |
| Change in earnout liability | | (28,300) | (6,409) | (21,891) |
| **Total Other Loss** | | **(137,529)** | **(71,432)** | **(66,097)** |
| **Income Before Income Taxes** | | **469,228** | **246,384** | **222,844** |
| Income tax expense | | 48,782 | 25,608 | 23,174 |
| **Consolidated Net Income** | | **420,446** | **220,776** | **199,670** |
| Net income attributable to noncontrolling interests | | (310,862) | (166,433) | (144,429) |
| **Net Income Attributable to Blue Owl Capital Inc.** | $ | **109,584** | $ **54,343** | $ **55,241** |

*Assets Under Management*

| **Blue Owl** |
|---|
| **AUM: $251.1 billion** |
| **FPAUM: $159.8 billion** |

| **Credit** | **GP Strategic Capital** | **Real Assets** |
|---|---|---|
| **AUM: $135.7 billion** | **AUM: $66.0 billion** | **AUM: $49.4 billion** |
| **FPAUM: $91.0 billion** | **FPAUM: $37.3 billion** | **FPAUM: $31.5 billion** |
| **Direct Lending** | **GP Minority Stakes** | **Net Lease** |
| AUM: $98.1 billion | AUM: $62.4 billion | AUM: $33.9 billion |
| FPAUM: $58.6 billion | FPAUM: $35.9 billion | FPAUM: $17.4 billion |
| **Alternative Credit** | **GP Debt Financing** | **Real Estate Credit** |
| AUM: $10.5 billion | AUM: $2.8 billion | AUM: $15.5 billion |
| FPAUM: $5.7 billion | FPAUM: $1.2 billion | FPAUM: $14.1 billion |
| **Investment Grade Credit** | **Professional Sports Minority Stakes** | |
| AUM: $17.6 billion | AUM: $0.9 billion | |
| FPAUM: $17.7 billion | FPAUM: $0.3 billion | |
| **Liquid Credit** | | |
| AUM: $7.3 billion | | |
| FPAUM: $7.2 billion | | |
| **Other** | | |
| AUM: $2.3 billion | | |
| FPAUM: $1.7 billion | | |

33.    The FY24 10-K went on to describe the alleged factors impacting the Company's business environment, including that the Company saw "no meaningful pressure to our asset base from redemptions" and "ended the fourth quarter of 2024 with substantial available capital to

deploy, reporting approximately $22.6 billion of AUM not yet paying fees." The FY24 10-K stated:

**Business Environment**

Our business is impacted by conditions in the financial markets and economic conditions in the United States, and to a lesser extent, globally.

We believe that our management-fee centric business model and base of Permanent Capital contribute to the resiliency of our earnings and the strength of our business growth, particularly during periods of market uncertainty and volatility, as we have seen over the past few years. During the fourth quarter of 2024, industry M&A and capital markets activity remained moderately constructive, a continuation of the improvement relative to late 2022 and early 2023.

Over the past twelve months, 91% of our GAAP and FRE management fees were generated by Permanent Capital and the remainder was predominantly from long-dated capital, with ***no meaningful pressure to our asset base from redemptions.*** The fourth quarter of 2024 was a record fundraising quarter for Blue Owl, in which we raised $9.5 billion of equity across an increasingly diversified set of products and strategies. Inclusive of debt, we raised $18.1 billion of capital in the fourth quarter and $47.5 billion in 2024. Fundraising and capital deployment contributed to management fee growth of over 25% compared with the prior year. We ended the fourth quarter of 2024 with substantial available capital to deploy, reporting approximately $22.6 billion of AUM not yet paying fees.

(Emphasis added).

34.    The FY24 10-K purported to warn of risks which "could" or "may" impact the Company negatively, including that BDC fees "comprise a substantial majority of our revenues" and the Company is "vulnerable to an increased number of investors seeking to participate in share redemption programs or tender offers of our non-traded products." The FY24 10-K stated:

***Management fees and other fees comprise a substantial majority of our revenues and a reduction in such fees could have an adverse effect on our results of operations and the level of cash available for distributions to our stockholders.***

*BDCs*

The investment advisory and management agreements we have with each of our BDCs categorize the fees we receive as: (a) base management fees, which are paid quarterly and generally increase or decrease based on the average fair value of our

11

BDC's gross assets (excluding cash and cash equivalents) or average fair value of gross assets (excluding cash) plus undrawn commitments, (b) Part I Fees and (c) Part II Fees. ***If any of our BDCs' gross assets or net investment income (before Part I Fees and Part II Fees) were to decline significantly for any reason, including, without limitation, due to fair value accounting requirements, the poor performance of its investments or the inability or increased cost to obtain or maintain borrowings for each of our BDCs, the amount of the fees we receive from our BDCs, including the base management fee and the Part I Fees, would also decline significantly, which could have an adverse effect on our revenues and results of operations.*** Our investment advisory and management agreements typically provide that the rates at which we earn advisory fees from certain of our BDCs increase after such BDCs are publicly listed (where before the listing the advisory fees typically are a reduced base management fee with a reduced or no Part I or II Fees). If these BDCs do not become publicly listed on anticipated timeframes or at all for any reason, including the NAV performance of our BDCs, Blue Owl will not benefit from this increase, and those BDCs may need to return their capital to investors, further reducing our management fees.

* * *

***We are vulnerable to an increased number of investors seeking to participate in share redemption programs or tender offers of our non-traded products.***

In recent periods we have launched a number of non-traded products, including BDCs and REITs. Non-traded products often conduct share redemption programs or tender offers to provide liquidity to investors in such vehicles. While such share redemption programs and tender offers may contain restrictions that limit the amount of shares that may be redeemed or purchased in particular periods, an increase in the number of investors requesting redemptions or participating in tender offers, or an increase in the amount of shares redeemed or purchased through such redemption programs or tender offers, of our non-traded products could lead to a decline in the management fees and incentive fees we receive. Economic events affecting the U.S. economy, such as volatility in the financial markets, inflation, fluctuations in interest rates or global or national events that are beyond our control, could cause investors to request redemption of an increased number of shares pursuant to the share redemption programs of our non-traded products, potentially in excess of established limits. Such prolonged economic disruptions have caused a number of similar products to deny redemption requests or to suspend or partially suspend their share

(Emphasis added).

35.    The FY24 10-K concluded that, "[b]ased on management's experience and [the] current level of liquidity and assets under management" the Company's "current liquidity position

and cash generated from management fees will continue to be sufficient" to meet anticipated needs. The FY24 10-K stated:

> **Liquidity and Capital Resources**
>
> *Overview*
>
> We rely on management fees as the primary source of our operating liquidity. From time to time we may rely on the use of our Revolving Credit Facility between management fee collection dates, which generally occur on a quarterly basis. We may also rely on our Revolving Credit Facility for liquidity needed to fund acquisitions, which we may replace with longer-term financing, subject to market conditions.
>
> We ended the fourth quarter of 2024 with $152.1 million of cash and cash equivalents and approximately $1.6 billion available under our Revolving Credit Facility. Based on management's experience and our current level of liquidity and assets under management, we believe that our current liquidity position and cash generated from management fees will continue to be sufficient to meet our anticipated working capital needs for at least the next 12 months.

36.    On May 1, 2025, the Company reported its financial results for the quarter ended March 31, 2025 in an investor presentation, simultaneously published with the SEC on a Form 8-K as Exhibit 99.2. The investor presentation purported to report the Company's financial results, GAAP historical trends, the performance of the Company's credit platform, and the Company's liquidity. The investor presentation stated:



## Historical Trends (GAAP)

- **GAAP Management Fees** of $2,150.4 million for the last twelve months, increased 33% compared to prior year
- **GAAP Consolidated Net Income** of $345.1 million for the last twelve months, compared to $290.8 million in the prior year
- **GAAP Net Income Attributable to Class A Shares** of $91.9 million for the last twelve months, compared to $71.1 million in the prior year

## Credit Platform

- **AUM** of $139.2 billion, increased 53% since March 31, 2024
  - The increase was primarily driven by the Kuvare and Atalaya Acquisitions, as well as capital raised in products from the direct lending strategy
- **FPAUM** of $92.9 billion, increased 58% since March 31, 2024
  - The increase was primarily driven by the Kuvare and Atalaya Acquisitions, as well as capital raised in products from the direct lending strategy and deployment across the platform
- **Direct Lending Originations** during the quarter were $12.8 billion with net deployment of $4.5 billion
  - Direct Lending Originations for the last twelve months were $55.8 billion with net deployment of $18.2 billion
- **AUM Not Yet Paying Fees** totaled $16.7 billion, reflecting expected annual management fees of $228 million once deployed
- **Direct Lending Gross Returns**[1] of 3.1% for 1Q'25 and 13.3% over the last twelve months ended 1Q'25
- **Alternative Credit Gross Returns**[1] of 6.1% for 1Q'25 and 15.2% over the last twelve months ended 1Q'25

## Supplemental Liquidity Metrics

As of March 31, 2025, the average maturity of the Company's outstanding notes is ~10 years.



37.    On May 5, 2025, the Company submitted its quarterly report for the period ended March 31, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial

results and reporting additional financial results, including the alleged performance of the Company's BDCs in general, and OBDC and OBDC II in particular. The quarterly report further stated the alleged factors impacting the Company's business environment, including that there was "with no meaningful pressure on our asset base from redemptions." Finally, the quarterly report asserted "[b]ased on management's experience and [the] current level of liquidity and assets under management" the Company's "current liquidity position and cash generated from management fees will continue to be sufficient" to meet anticipated needs. The quarterly report stated:

> ***Over the past twelve months, approximately 88% and 89% of our GAAP and FRE management fees,*** respectively, were generated by Permanent Capital and the remainder was predominantly from long-dated capital, ***with no meaningful pressure on our asset base from redemptions.*** We raised $10.7 billion of capital during the first quarter of 2025, with $6.7 billion of equity capital raised, resulting in $48.6 billion of total capital raised during the last twelve months, with $29.4 billion of equity capital raised. Fundraising and capital deployment contributed to management fee growth of over 30% over the last twelve months, compared with the corresponding period. We ended the first quarter of 2025 with substantial available capital to deploy, reporting approximately $23.4 billion of AUM not yet paying fees.

| (dollars in millions) | Year of Inception | AUM | Capital Raised (6) | Invested Capital (7) | Realized Proceeds (8) | Unrealized Value (9) | Total Value | MoIC Gross (10) | MoIC Net (11) | IRR Gross (12) | IRR Net (13) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Direct Lending** | | | | | | | | | | | |
| Blue Owl Capital Corporation (1)(2) | 2016 | $ 16,375 | $ 5,977 | $ 5,977 | $ 3,700 | $ 5,953 | $ 9,653 | 1.87x | 1.61x | 13.7 % | 9.8 % |
| Blue Owl Capital Corporation III (1)(2) | 2020 | $ 5,056 | $ 1,845 | $ 1,842 | $ 720 | $ 1,839 | $ 2,559 | 1.46x | 1.39x | 14.0 % | 11.9 % |
| Blue Owl Credit Income Corp. (1)(3) | 2020 | $ 32,303 | $ 15,448 | $ 14,218 | $ 2,223 | $ 14,522 | $ 16,745 | NM | 1.18x | NM | 11.1 % |
| Blue Owl Technology Finance Corp. (1)(4) | 2018 | $ 7,588 | $ 3,392 | $ 3,392 | $ 1,047 | $ 3,595 | $ 4,642 | 1.49x | 1.37x | 12.1 % | 8.9 % |
| Blue Owl Technology Finance Corp. II (1)(4) | 2021 | $ 8,665 | $ 4,184 | $ 2,880 | $ 397 | $ 2,971 | $ 3,368 | 1.23x | 1.17x | 16.1 % | 11.5 % |
| **Alternative Credit** | | | | | | | | | | | |
| Blue Owl Asset Special Opportunities Fund VIII (5) | 2021 | $ 1,841 | $ 1,849 | $ 1,728 | $ 296 | $ 2,050 | $ 2,346 | 1.38x | 1.36 x | 21.6 % | 16.4 % |

*Three Months Ended March 31, 2025, Compared to the Three Months Ended March 31, 2024*

| (dollars in thousands) | Three Months Ended March 31, | | $ Change |
| | 2025 | 2024 | |
|---|---|---|---|
| **Revenues** | | | |
| Management fees, net (includes Part I Fees of $132,556 and $120,161) | $ 604,186 | $ 447,898 | $ 156,288 |
| Administrative, transaction and other fees | 72,988 | 63,397 | 9,591 |
| Performance revenues | 6,312 | 2,045 | 4,267 |
| **Total Revenues, Net** | **683,486** | **513,340** | **170,146** |
| **Expenses** | | | |
| Compensation and benefits | 325,940 | 224,791 | 101,149 |
| Amortization of intangible assets | 89,473 | 56,195 | 33,278 |
| General, administrative and other expenses | 190,779 | 76,748 | 114,031 |
| **Total Expenses** | **606,192** | **357,734** | **248,458** |
| **Other Loss** | | | |
| Net gains (losses) on investments | (7,700) | 3,173 | (10,873) |
| Interest and dividend income | 11,230 | 4,755 | 6,475 |
| Interest expense | (38,524) | (22,484) | (16,040) |
| Change in TRA liability | (4,276) | 1,019 | (5,295) |
| Change in warrant liability | — | (14,700) | 14,700 |
| Change in earnout liability | 2,318 | (585) | 2,903 |
| **Total Other Loss** | **(36,952)** | **(28,822)** | **(8,130)** |
| **Income Before Income Taxes** | **40,342** | **126,784** | **(86,442)** |
| Income tax expense | 3,672 | 14,771 | (11,099) |
| **Consolidated Net Income** | **36,670** | **112,013** | **(75,343)** |
| Net income attributable to noncontrolling interests | (29,240) | (86,922) | 57,682 |
| **Net Income Attributable to Blue Owl Capital Inc.** | **$ 7,430** | **$ 25,091** | **$ (17,661)** |

### Liquidity and Capital Resources

*Overview*

We rely on management fees as the primary source of our operating liquidity. From time to time we may rely on the use of our Revolving Credit Facility (as defined in Note 7 to our Financial Statements) between management fee collection dates, which generally occur on a quarterly basis. We may also rely on our Revolving Credit Facility for liquidity needed to fund acquisitions, which we may replace with longer-term financing, subject to market conditions. We ended the first quarter of 2025 with $97.6 million of cash and cash equivalents and approximately $1.0 billion available under our Revolving Credit Facility. ***Based on management's***

*experience and our current level of liquidity and assets under management, we believe that our current liquidity position and cash generated from management fees will continue to be sufficient to meet our anticipated working capital needs for at least the next 12 months.*

(Emphasis added).

38.     On July 31, 2025, the Company reported its financial results for the quarter ended June 30, 2025 in an investor presentation, simultaneously published with the SEC on a Form 8-K as Exhibit 99.2. The investor presentation purported to report the Company's financial results, GAAP historical trends, the performance of the Company's credit platform, and the Company's liquidity. The investor presentation stated:

| Financial Results | • **GAAP Net Income** of $17.4 million, or $0.03 per basic and $0.02 per diluted Class A Share<br>• **Fee-Related Earnings** of $358.3 million, or $0.23 per Adjusted Share<br>• **Distributable Earnings** of $323.0 million, or $0.21 per Adjusted Share |
|---|---|

| Capital Metrics | • **AUM** of $284.1 billion, up 48% since June 30, 2024<br>   ◦ **FPAUM** of $177.5 billion, up 46% since June 30, 2024<br>   ◦ **Permanent Capital** of $204.6 billion, up 41% since June 30, 2024<br>   ◦ **AUM Not Yet Paying Fees** of $28.6 billion, reflecting expected annual management fees of approximately $379 million once deployed<br>• **New Capital Commitments Raised** of $13.9 billion ($12.1 billion new equity capital) in the quarter<br>• **FPAUM Raised and Deployed** of $5.4 billion in the quarter |
|---|---|



## Historical Trends (GAAP)

- **GAAP Management Fees** of $2,308.0 million for the last twelve months, increased 35% compared to prior year
- **GAAP Consolidated Net Income** of $277.7 million for the last twelve months, compared to $394.8 million in the prior year
- **GAAP Net Income Attributable to Class A Shares** of $75.4 million for the last twelve months, compared to $92.2 million in the prior year



## Credit Platform

- **AUM** of $145.5 billion, increased 53% since June 30, 2024
  - The increase was primarily driven by the Kuvare and Atalaya Acquisitions, as well as capital raised in products from the direct lending strategy
- **FPAUM** of $93.7 billion, increased 47% since June 30, 2024
  - The increase was primarily driven by the Kuvare and Atalaya Acquisitions, as well as capital raised in products from the direct lending strategy and deployment across the platform
- **Direct Lending Originations** during the quarter were $9.7 billion with net deployment of $2.5 billion
  - Direct Lending Originations for the last twelve months were $46.9 billion with net deployment of $13.5 billion
- **AUM Not Yet Paying Fees** totaled $19.3 billion, reflecting expected annual management fees of approximately $282 million once deployed
- **Direct Lending Gross Returns**[1] of 3.0% for 2Q'25 and 13.5% over the last twelve months ended 2Q'25
- **Alternative Credit Gross Returns**[1] of 2.0% for 2Q'25 and 15.7% over the last twelve months ended 2Q'25

## Supplemental Liquidity Metrics

As of June 30, 2025, the average maturity of the Company's outstanding notes is ~10 years.

**Total Debt ($M)**
- $3,290
- $780 — Revolving Credit Facility
- $60 — 2028 Unsecured Notes
- $350 — 2051 Unsecured Notes
- $400 — 2032 Unsecured Notes
- $700 — 2031 Unsecured Notes
- $1,000 — 2034 Unsecured Notes

**Available Liquidity ($M)**
- $118 — Revolving Credit Facility
- $934 — Cash and Cash Equivalents

**Credit Ratings**
- BBB+ — Fitch
- Baa2 — Moody's
- BBB — S&P

**$1.1B** Available Liquidity

**3.8%** Cost of Debt[1]

39. On August 1, 2025, the Company submitted its quarterly report for the period ended June 30, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results and reporting additional purported financial results, including the performance of the Company's BDCs in general, and OBDC and OBDC II in particular. The quarterly report further stated the alleged factors impacting the Company's business environment, including that there was

"with no meaningful pressure on our asset base from redemptions." Finally, the quarterly report

asserted "[b]ased on management's experience and [the] current level of liquidity and assets under

management" the Company's "current liquidity position and cash generated from management

fees will continue to be sufficient" to meet anticipated needs. The quarterly report stated:

> Over the past twelve months, approximately 86% and 87% of our GAAP and FRE management fees, respectively, were generated by Permanent Capital and the remainder was predominantly from long-dated capital, ***with no meaningful pressure on our asset base from redemptions.*** We had a record fundraising quarter, bringing in $13.9 billion of new capital commitments during the second quarter of 2025, resulting in $54.6 billion of total capital raised during the last twelve months. Fundraising, capital deployment, and acquisitions contributed to management fee growth of over 30% over the last twelve months, compared with the prior corresponding period. We ended the second quarter of 2025 with substantial available capital to deploy, reporting approximately $28.6 billion of AUM not yet paying fees.

> During the second quarter of 2025, industry M&A and capital markets activity remained relatively lackluster, further shining a spotlight on the importance of scale and incumbency in generating deployment opportunities during more challenged market landscapes. While the market volatility in April and subsequent pause of capital markets did not extend into the back half of the second quarter, we believe it pushed out further the return of significant M&A activity, extending pipelines across the industry.

> Despite these dynamics, the second quarter of 2025 was moderately active for direct lending deployment, with $9.7 billion of originations, bringing our last twelve month gross deployment to $46.9 billion and net funded deployment to $13.5 billion. Much like in direct lending, we saw cross-platform network effects benefiting our alternative credit and investment grade credit strategies, demonstrating the expanding role that private lenders are being asked to play in the broader credit markets. In alternative credit, we renewed and upsized a forward flow agreement with a large consumer lending platform and upsized a transaction with a U.K.-based lender that funds both U.S. and U.K. small businesses.

| | | | | | | | | | MoIC | | IRR | |
| (dollars in millions) | Year of Inception | AUM | Capital Raised (6) | Invested Capital (7) | Realized Proceeds (8) | Unrealized Value (9) | Total Value | Gross (10) | Net (11) | Gross (12) | Net (13) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Direct Lending** | | | | | | | | | | | |
| Blue Owl Capital Corporation (1)(2) | 2016 | $ 21,497 | $ 7,736 | $ 7,736 | $ 3,915 | $ 7,739 | $ 11,654 | 1.70x | 1.51x | 13.6% | 9.9% |
| Blue Owl Credit Income Corp. (1)(3) | 2020 | $ 34,237 | $ 17,540 | $ 16,106 | $ 2,614 | $ 16,270 | $ 18,884 | NM | 1.17x | NM | 10.6% |
| Blue Owl Technology Finance Corp. (1)(4) | 2018 | $ 16,543 | $ 7,707 | $ 7,707 | $ 1,121 | $ 7,947 | $ 9,068 | 1.23x | 1.18x | 12.0% | 9.0% |
| **Alternative Credit** | | | | | | | | | | | |
| Blue Owl Asset Special Opportunities Fund VIII (5) | 2021 | $ 1,765 | $ 1,849 | $ 1,711 | $ 415 | $ 1,928 | $ 2,343 | 1.41x | 1.37 x | 20.1% | 15.2% |

| | Three Months Ended June 30, | | |
| (dollars in thousands) | 2025 | 2024 | $ Change |
|---|---|---|---|
| **Revenues** | | | |
| Management fees, net (includes Part I Fees of $137,965 and $129,442) | $ 623,369 | $ 465,754 | $ 157,615 |
| Administrative, transaction and other fees | 78,758 | 83,906 | (5,148) |
| Performance revenues | 979 | 188 | 791 |
| **Total Revenues, Net** | 703,106 | 549,848 | 153,258 |
| **Expenses** | | | |
| Compensation and benefits | 326,300 | 227,103 | 99,197 |
| Amortization of intangible assets | 89,472 | 56,734 | 32,738 |
| General, administrative and other expenses | 188,052 | 93,458 | 94,594 |
| **Total Expenses** | 603,824 | 377,295 | 226,529 |
| **Other Loss** | | | |
| Net gains (losses) on investments | (2,420) | 2,624 | (5,044) |
| Interest and dividend income | 11,015 | 13,787 | (2,772) |
| Interest expense | (41,986) | (32,715) | (9,271) |
| Change in TRA liability | (2,026) | (2,978) | 952 |
| Change in warrant liability | — | 3,050 | (3,050) |
| Change in earnout liability | 20,629 | (70) | 20,699 |
| **Total Other Loss** | (14,788) | (16,302) | 1,514 |
| **Income Before Income Taxes** | 84,494 | 156,251 | (71,757) |
| Income tax expense | 13,798 | 18,197 | (4,399) |
| **Consolidated Net Income** | 70,696 | 138,054 | (67,358) |
| Net income attributable to noncontrolling interests | (53,270) | (104,109) | 50,839 |
| **Net Income Attributable to Blue Owl Capital Inc.** | $ 17,426 | $ 33,945 | $ (16,519) |

## Liquidity and Capital Resources

### *Overview*

We rely on management fees as the primary source of our operating liquidity. From time to time we may rely on the use of our Revolving Credit Facility between management fee collection dates, which generally occur on a quarterly basis. We may also rely on our Revolving Credit Facility for liquidity needed to fund acquisitions, which we may replace with longer-term financing, subject to market conditions.

We ended the second quarter of 2025 with $117.6 million of cash and cash equivalents and approximately $0.9 billion available under our Revolving Credit Facility. ***Based on management's experience and our current level of liquidity and assets under management, we believe that our current liquidity position and cash generated from management fees will continue to be sufficient to meet our anticipated working capital needs for at least the next 12 months.***

(Emphasis added).

40.    The above-referenced statements were materially false and/or misleading, and failed to disclose material adverse facts as the Individual Defendants failed to disclose to investors: (i) that Blue Owl was experiencing a meaningful pressure on its asset base from BDC redemptions; (ii) that, as a result, the Company was facing undisclosed liquidity issues; (iii) that, as a result, the Company would be likely to limit or halt redemptions of certain BDCs; and (iv) that, as a result of the foregoing, the positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## **THE TRUTH EMERGES**

41.    On October 30, 2025, before the market opened, the Company reported financial results for the third quarter of 2025. The Company reported, among other things, new capital commitments reached $14 billion in the third quarter and $57 billion over the last twelve months, and direct lending originations during the quarter were $10.9 billion and $46.8 billion over the last twelve months. Yet the Company reported fee-related earnings of only $376.2 million, which missed consensus estimates; fee-related earnings margins of 57.1% which missed expectations by roughly 20 basis points; and performance revenue which fell 33% year over year to only $188,000.

On that date, the Company reported its financial results for the quarter ended September 30, 2025 in an investor presentation, simultaneously published with the SEC on a Form 8-K as Exhibit 99.2. The investor presentation stated:

| Financial Results | • **GAAP Net Income** of $6.3 million, or $0.01 per basic and $0.01 per diluted Class A Share<br>• **Fee-Related Earnings** of $376.2 million, or $0.24 per Adjusted Share<br>• **Distributable Earnings** of $341.0 million, or $0.22 per Adjusted Share |
|---|---|
| Capital Metrics | • **AUM** of $295.6 billion, up 26% since September 30, 2024<br>  ◦ **FPAUM** of $183.8 billion, up 19% since September 30, 2024<br>  ◦ **Permanent Capital** of $213.8 billion, up 19% since September 30, 2024<br>  ◦ **AUM Not Yet Paying Fees** of $28.4 billion, reflecting expected annual management fees of approximately $361 million once deployed<br>• **New Capital Commitments Raised** of $14.4 billion ($11.2 billion new equity capital) in the quarter<br>• **FPAUM Raised and Deployed** of $11.0 billion in the quarter |

## Fundraising



- **New Capital Commitments Raised** of $14.4 billion in the quarter
  - New Capital Commitments Raised of $57.0 billion during the last twelve months
- **Total Equity Fundraise** of $11.2 billion during the quarter was driven by $5.6 billion in Credit, $3.0 billion in Real Assets and $2.7 billion in GP Strategic Capital
- **Private Wealth Equity Fundraise** of $4.2 billion during the quarter was primarily driven by products from the direct lending and alternative credit strategies in Credit and products from the net lease strategy in Real Assets
  - Private Wealth Equity Fundraise of $16.2 billion during the last twelve months
- **Institutional Equity Fundraise** of $7.0 billion during the quarter was primarily driven by products from the direct lending and investment grade credit strategies in Credit, products from the GP minority stakes strategy in GP Strategic Capital, and products from the net lease strategy in Real Assets
  - Institutional Equity Fundraise of $23.3 billion during the last twelve months

## Credit Platform

- **AUM** of $152.1 billion, increased 18% since September 30, 2024
  - The increase was primarily driven by capital raised in products from the direct lending strategy
- **FPAUM** of $97.3 billion, increased 9% since September 30, 2024
  - The increase was primarily driven by capital raised in products from the direct lending strategy and deployment across the platform, partially offset by distributions in the direct lending strategy
- **Direct Lending Originations** during the quarter were $10.9 billion with net deployment of $2.9 billion
  - Direct Lending Originations for the last twelve months were $46.8 billion with net deployment of $12.1 billion
- **AUM Not Yet Paying Fees** totaled $18.2 billion, reflecting expected annual management fees of approximately $251 million once deployed
- **Direct Lending Gross Returns**[1] of 3.1% for 3Q'25 and 13.2% over the last twelve months ended 3Q'25
- **Alternative Credit Gross Returns**[1] of 3.9% for 3Q'25 and 15.9% over the last twelve months ended 3Q'25

| (dollars in thousands, except per share data) | Quarter Ended | | | Last Twelve Months | | |
|---|---|---|---|---|---|---|
| | 3Q'25 | 3Q'24 | % Change | 3Q'25 | 3Q'24 | % Change |
| **GAAP Revenues** | | | | | | |
| Credit (including Part I Fees of $149,173, $138,300, $552,392 and $493,551) | $ 401,605 | $ 325,210 | 23% | $ 1,474,268 | $ 1,133,606 | 30% |
| Real Assets | 91,840 | 49,705 | 85% | 361,218 | 166,227 | 117% |
| GP Strategic Capital (including Part I Fees of $1,268, $2,376, $6,150 and $8,651) | 152,210 | 148,394 | 3% | 594,827 | 547,706 | 9% |
| Management Fees, Net | 645,655 | 523,309 | 23% | 2,430,313 | 1,847,539 | 32% |
| Administrative, Transaction and Other Fees | 82,147 | 77,289 | 6% | 303,568 | 304,934 | —% |
| Performance Revenues | 188 | 280 | (33%) | 12,062 | 5,628 | 114% |
| **GAAP Revenues** | **727,990** | **600,878** | **21%** | **2,745,943** | **2,158,101** | **27%** |

| (dollars in thousands, except per share data) | Quarter Ended | | Last Twelve Months | |
|---|---|---|---|---|
| | 3Q'25 | 3Q'24 | 3Q'25 | 3Q'24 |
| Income Before Income Taxes | $ 55,321 | $ 112,120 | $ 254,230 | $ 479,461 |
| GAAP Revenues | $ 727,990 | $ 600,878 | $ 2,745,943 | $ 2,158,101 |
| **GAAP Margin** | **7.6 %** | **18.7 %** | **9.3 %** | **22.2 %** |
| | | | | |
| Fee-Related Earnings Before Noncontrolling Interests | $ 392,247 | $ 337,223 | $ 1,466,056 | $ 1,223,824 |
| FRE Revenues | $ 686,997 | $ 568,327 | $ 2,548,921 | $ 2,043,690 |
| **FRE Margin** | **57.1 %** | **59.3 %** | **57.5 %** | **59.9 %** |

42. On the same date, the Company hosted an earnings call to discuss its financial results. As part of his introductory remarks, the Company's Co-CEO, Defendant Lipschultz, assured investors the Company continued to see "no signs of meaningful stress." Yet during the earnings call, analysts pushed management to explain how it expects to absorb the sizable originations the Company granted in the quarter, with one analyst form TD Cowen remarking "despite the strong macro dynamics, the fund performance has been pretty weak two quarters in a row." In response, the Company's CFO, Defendant Kirshenbaum, assured investors that this was only "short-term noise" as "[t]his quarter, we saw some mark-to-market on swaps that we have around debt that's in place." Defendant Lipschultz further assured investors the Company's financial results were merely "an accounting matter, the swap itself gets marked for accounting purposes unrelated to the fact that really, it's just serving to create this fixed income stream. So that is just an accounting quirk." During the earnings call, the following statements were made:

**Marc S. Lipschultz**

As we have highlighted in previous earnings calls and continue to call out, the health of our credit portfolio remains excellent with an average annual realized loss +of just 13 basis points and ***no signs of meaningful stress.*** In direct lending, the

modest level of nonaccruals we have seen are not thematic in nature, and there's not been an uptick in our watch list levels.

\* \* \*

**Analyst, TD Cowen, Research Division:**

I wish it was a day we could ask more than one. Maybe sticking with the digital story. I was wondering if you could *help us understand how quickly you might be able to absorb the most recent flagship fundraising given the size of the pipeline?* And then secondarily, *despite the strong macro dynamics, the fund performance has been pretty weak two quarters in a row.* I was wondering if you can help us unpack why that's the case? And would that be a hindrance to drive growth from here?

\* \* \*

**Alan Kirshenbaum**

Sure. Thanks, Bill. *This quarter, we saw some mark-to-market on swaps that we have around debt that's in place.* So when we look at this, we see these are very long-term projects. When you look at the underlying performance of the data centers, they are very strong. And I'll tell you, on average, across our digital infrastructure funds, Fund I, II and III, we have IRRs in the high teens. So we're experiencing great IRRs for our investors. *This is short-term noise.*

**Marc S. Lipschultz**

Yes. And just to frame that in a way that will be apparent to everyone I'm sure it's already apparent to you. These are very long-dated leases with rent escalators, not to be lost by the way, that escalator is very powerful over time. But to match, we will -- we swap debt in many cases against them. So we've locked in our returns and our returns are outstanding. *But as an accounting matter, the swap itself gets marked for accounting purposes unrelated to the fact that really, it's just serving to create this fixed income stream. So that is just an accounting quirk.*

43.    On this news, the Company's share price fell $0.70 per share, or 4.23%, or to close at $15.86 per share on October 30, 2025, on unusually heavy trading volume.

44.    On November 5, 2025, after the market closed, OBDC and OBDC II announced they had entered into a definitive merger agreement. The announcement revealed "OBDC II does not anticipate conducting additional tender offers prior to the merger." The announcement alleged

the "proposed merger enhances liquidity for shareholders of the combined company." The announcement also revealed that, under the terms of the proposed merger, "shareholders of OBDC II will receive newly issued whole shares of OBDC for each share of OBDC II based on the exchange ratio determined prior to closing." "The exchange ratio will be calculated based upon (i) the NAV [net asset value] per share of OBDC and OBDC II, each determined before merger close and (ii) the market price of OBDC common stock ("OBDC Price") before merger close." The announcement stated:

> Blue Owl Capital Corporation (NYSE: OBDC) ("OBDC") and Blue Owl Capital Corporation II ("OBDC II") announced today that they have entered into a ***definitive merger agreement, with OBDC as the surviving company,*** subject to certain shareholder approvals of OBDC II and other customary closing conditions. Following the recommendation of each of their special committees, the boards of directors of both OBDC and OBDC II have unanimously approved the transaction.

> \* \* \*

> ***Enhances Shareholder Liquidity*** and Potential for Broader Investor Participation – The proposed merger enhances liquidity for shareholders of the combined company and may improve the ability to attract a broader, more diverse investor base.

> \* \* \*

> Under the terms of the proposed merger, shareholders of ***OBDC II will receive newly issued whole shares of OBDC for each share of OBDC II based on the exchange ratio determined prior to closing.*** No fractional shares will be issued as a result of the merger. In lieu of issuing fractional shares, OBDC will directly pay an amount in cash equal to the amount calculated as a result of the exchange ratio to each OBDC II stockholder who would otherwise have been entitled to a fraction of a share. ***The exchange ratio will be calculated based upon (i) the NAV per share of OBDC and OBDC II, each determined before merger close and (ii) the market price of OBDC common stock ("OBDC Price") before merger close.***

> \* \* \*

> Additionally, ***OBDC II does not anticipate conducting additional tender offers prior to the merger***.

(Emphasis added).

45.    On this news, the Company's share price fell $0.74 per share or 4.72%, to close at $14.95 per share on November 6, 2025, on unusually heavy trading volume.

46.    On Sunday, November 16, 2025, *Financial Times* published an article entitled "Blue Owl private credit fund merger leaves some investors facing 20% hit." The article provided an interview with the CFO of OBDC, Jonathan Lamm, revealing that "If shareholders were to vote down the deal, [Lamm] acknowledged that Blue Owl Capital Corporation II might be forced to limit redemptions." The article further reported details of two critical aspects of the merger. First, OBDC II investors would indeed be blocked from making any redemptions until the merger completes in 2026. Second, as part of the merger, OBDC II shareholders would see the value of their investments fall by about 20 per cent. Investors in OBDC II would see their investments fall due to the terms of the exchange, under which they would receive OBDC shares based, in part, on OBDC's market price, which trades at a discount of about 20% to the stated value of its assets. The article affirmed Lamm "conceded in an interview with the Financial Times that at current prices, the investors in Blue Owl Capital Corporation II could take a potential haircut on their investments." The article continued, disclosing "the trading price of OBDC, Lamm added, had been hit by souring sentiment on private credit markets[.]" Specifically, *Financial Times* reported as follows:

> Blue Owl has blocked redemptions in one of its earliest private credit funds as it merges with a larger vehicle overseen by the asset manager in a deal that could leave investors with large losses.
>
> Investors in the fund being acquired could face losses of about 20 per cent on their holdings and will not be able to withdraw their money in advance of the merger, according to a press release.
>
> The deal underscores the risks that retail investors have taken in pouring hundreds of billions of dollars into private debt funds carrying limited liquidity rights. The fund merger also comes as scrutiny builds on the valuations and returns of private

credit funds, which have caused publicly listed debt funds, called BDCs, to sell off and trade at steep discounts to the stated value of their assets.

Earlier this month, Blue Owl told its shareholders that it planned to merge its Blue Owl Capital Corporation II fund, which has $1bn in assets and was one of the first private debt funds targeting wealthy individual investors, with its OBDC fund, which has $17bn in assets.

Blue Owl Capital Corporation II investors are being asked to exchange their shares in the private fund for shares in OBDC at the stated net asset value of both funds. However, OBDC trades on public markets at a discount of about 20 per cent to the stated value of its assets. Blue Owl Capital Corporation II, meanwhile, is not publicly traded and instead offers investors the ability to redeem cash every quarter at the fund's stated value.

\* \* \*

***The merger of the two funds comes as redemptions in Blue Owl Capital Corporation II have climbed this year to a level where it would eventually be forced to restrict investor redemptions***.

Investors in Blue Owl Capital Corporation II have pulled $150mn from the fund through the first nine months of this year, a 20 per cent increase from this time last year, according to securities filings. Redemptions in the third quarter nearly doubled to $60mn, or 6 per cent of its NAV.

***Jonathan Lamm, chief financial officer of OBDC, conceded in an interview with the Financial Times that at current prices, the investors in Blue Owl Capital Corporation II could take a potential haircut on their investments.***

\* \* \*

***The trading price of OBDC, Lamm added, had been hit by souring sentiment on private credit markets*** that was not backed up by the performance of Blue Owl's underlying loans.

\* \* \*

"There's no doubt that this is a no-brainer transaction at 95 cents," said Lamm of the newer merger. ***If shareholders were to vote down the deal, he acknowledged that Blue Owl Capital Corporation II might be forced to limit redemptions.***

(Emphasis added).

47.      On this news, the Company's share price fell $0.85 per share, or 5.8%, to close at $13.77 per share on November 17, 2025, on unusually heavy trading volume.

48.      On November 19, 2025, OBDC and OBDC II announced they terminated the proposed merger, citing "current market conditions," but "with plans to reevaluate alternatives in the future." Subject to board approval, OBDC II stated it "plans to reinstate the tender program in Q1 2026."

## SHARE REPURCHASES

49.      On February 5, 2025, the Director Defendants authorized a share repurchase program that would allow the Company to repurchase up to $150 million worth of its own common stock.

50.      During the Individual Defendants' wrongful course of conduct as detailed herein, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.

51.      As reported in the Company's SEC filings, the Individual Defendants caused the Company to spend an aggregate amount of approximately $1.69 million to repurchase 114,228 shares of its own common stock at artificially inflated prices in April 2025 at an average share price of $14.81 per share.

52.      When the truth emerged, the Company's share price fell to $13.77 per share – the price it should have been at all times had it not been artificially inflated by the wrongful conduct alleged herein. Accordingly, the repurchases should have cost the Company approximately $1.57 million.

53.      Despite this, while issuing false and misleading statements to the market, failing to exercise its oversight responsibilities, and causing the artificial inflation of the Company's share

price, the Individual Defendants caused the Company to repurchase 114,228 shares of its own common stock at artificially inflated prices, causing it to overpay for its own stock by at least $118,797.

54.    These harmful actions could not be the product of informed business judgment, nor could they be construed as being in the best interests of the Company. As a result, the Company has suffered substantial harm which was caused by, or otherwise permitted by, each of the Individual Defendants, in direct violation of their fiduciary duties owed to the Company.

## DAMAGE TO THE COMPANY

### Securities Class Action

55.    On December 3, 2025, a securities class action complaint was filed in the United States District Court for the Southern District of New York against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, in the case captioned: *Goldman v. Blue Owl Capital Inc., et al.*, Case No. 1:25-cv-10047 (S.D.N.Y.) ("Securities Class Action").

56.    As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers.  The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

### Unjust Compensation

57.    At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

58.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

59.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Share Repurchases**

60.     The Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $1.69 million to repurchase approximately 114,228 shares of its own common stock at artificially inflated prices. As the Company's stock was actually worth only $13.77 per share, the price at which it was trading when markets closed in November 2025, the Company overpaid for repurchases of its own stock by approximately $118,797.

**Additional Damage to the Company**

61.     In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

62.     The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

63.     The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

64.     At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

65.     Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE DIRECTOR DEFENDANTS

66.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

67.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors

that the Director Defendants were aware posed a risk of serious injury to the Company.

68.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

69.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

70.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid

wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

71.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were

aware, or should have been aware, posed a risk of serious injury to the Company.

72.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

**Code of Conduct**

73.    At all relevant times, the Company had in place its Code of Business Conduct ("Code of Conduct") which "applies to each Blue Owl principal executive officer, principal financial officer, principal accounting officer or controller, as well as all directors (including disinterested directors), other officers, employees (including temporary employees) and any other individual as directed by the Chief Compliance Officer (the "CCO") (each, a "Blue Owl Covered Person" and, collectively, "Blue Owl Covered Persons")."

74.    With respect to "Compliance with and Violations of the Code," the Code of Conduct states:

> You are required to ensure that you do not violate this Code. You are expected to use good judgment in recognizing situations where a violation of this Code may occur and to ensure that no violations occur. In situations where it is unclear whether this Code applies, you should consult with your supervisor or the CCO before taking any actions. Blue Owl may take disciplinary actions against you if you violate this Code, up to and including suspension or dismissal. Furthermore, if a violation of this Code also constitutes a violation of any law or regulation, you may be subject to legal action or penalties. In addition to ensuring you do not violate this Code, you are encouraged to report known or other suspected violations of this Code by others to your supervisor or the CCO.

75.    The Code of Conduct then provides the following summary, in relevant part:

> The principles covered in this Code are summarized here. Where applicable, additional information can be found in the corresponding Blue Owl policy.
>
> • Compliance with Laws and Regulations

Blue Owl is subject to many laws and regulations. Being aware of and complying with both the letter and spirit of all applicable laws and regulations is critical to our ability to accomplish our objectives.

In everything that you do on behalf of Blue Owl, you must use care not to violate any law or regulation and where it is not permissible for you to take certain actions, you may not ask someone to act on your behalf. You are responsible to know, understand and follow the laws and regulations that apply to your responsibilities on behalf of Blue Owl.

While you are not expected to be an expert on all applicable laws and regulations that apply to your responsibilities on behalf of Blue Owl, you are expected to know the laws and regulations well enough to recognize when an issue arises and to seek the advice of the CCO when appropriate.

• Conflicts of Interest

A conflict of interest may occur when your personal interests interfere in any way, or even appear to interfere, with the interests of Blue Owl. Similarly, a conflict of interest may also occur when your personal interests interfere with your ability to objectively and effectively perform your job. The overarching principle is that you must avoid any conflict, or appearance of a conflict, between your personal interests and our interests.

Examples of conflicts of interest may include

> (1) improperly causing Blue Owl to take action, or fail to take action, for your personal benefit rather than for the benefit of Blue Owl;
> (2) improperly using your position with Blue Owl or information that belongs to Blue Owl, including, but not limited to, knowledge about pending or potential investment transactions for personal gain;
> (3) using or communicating confidential information obtained in the course of your work for your or another's personal benefit; or
> (4) recommending, implementing or causing Blue Owl to consider any investment transactions with an entity in which you, directly or through family members, have any significant interest absent full disclosure.

Identifying a conflict of interest is not always clear cut. If you are ever in doubt, seek advice from the General Counsel and/or the CCO. Wherever possible, you should try to avoid situations in which a conflict of interest exists or appears to exist. Where a conflict of interest cannot be avoided, you must disclose the situation to the General Counsel and/or CCO.

• Corporate Opportunities

Blue Owl Covered Persons owe a duty to Blue Owl to advance its legitimate

interests when the opportunities to do so arises. You may not use Blue Owl property, information or position for your personal gain or the gain of a family member and you may not compete or prepare to compete with Blue Owl. Sometimes the line between personal and Blue Owl benefits is difficult to draw, and sometimes both personal and Blue Owl benefits may be derived from certain activities. The prudent course of conduct is to make sure that any use of Blue Owl property or services that is not solely for the benefit of Blue Owl is approved beforehand by the CCO. When you become aware of a financial opportunity as a result of your relationship with Blue Owl, your position at Blue Owl, or through your use of Blue Owl property regardless of the source, that opportunity belongs, in the first place, to Blue Owl.

• Fair Dealing

Blue Owl is committed to maintaining the highest level and ethical standards in the conduct of its business. Meeting this commitment is the responsibility of Blue Owl and each and every one of the Blue Owl Covered Persons. You must endeavor to deal fairly with our stockholders, fund investors, suppliers and business partners, or any portfolio companies or any other companies or individuals with whom we do business or come into contact, including fellow employees and our competitors. You must not take unfair advantage of these or other parties by means of manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

• Confidential Information

Confidential information includes, among other things, any nonpublic information concerning Blue Owl, including its business, financial performance, results or prospects and any nonpublic information provided by a third party with the expectation that the information will be kept confidential and used solely for the business purpose for which it was conveyed.

As an individual associated with Blue Owl, you may have access to or receive confidential or proprietary information about Blue Owl, its funds investors, suppliers, business partners or other third parties. You are expected to use such information properly and not in any way adverse to Blue Owl or our investors' interests and to protect all confidential information, regardless of its form or format, from the time of creation or receipt until its authorized disposal. In addition, you are responsible for understanding and complying with all policies protecting the privacy, confidentiality and security of confidential information. This obligation continues even after your association with Blue Owl ends, until such information becomes publicly available.

In addition, until disclosed in a public report to investors or to the SEC in the normal course, you must keep confidential all information concerning the securities being considered for purchase or sale by Blue Owl or its subsidiaries or affiliates, unless

approved by the General Counsel and CCO.

Refer to the Information Security/Data Privacy Policy and Reg FD Policy for further discussion.

• Public Disclosure

It is our policy that all information in our public communications—including SEC filings—be full, fair, accurate, timely and understandable.

All individuals who are involved in our disclosure process, including, but not limited to, members of the Disclosure Committee, must act in a manner consistent with this policy. In particular, they are required to maintain familiarity with the relevant disclosure requirements and are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about Blue Owl to others, whether within or outside Blue Owl, including our Independent Auditors.

Refer to the Reg FD Policy for further discussion.

**Audit Committee Charter**

76.     At all relevant times, the Company had in place its Audit Committee Charter which

sets forth the additional duties and responsibilities of the Audit Committee. The Audit Committee

Charter provides that:

The primary function of the Committee is to serve as an independent and objective party to assist the Board in fulfilling its oversight responsibilities for the Company's accounting and reporting processes and the audits of its financial statements by overseeing and monitoring:

a. the quality and integrity of the Company's financial statements and other financial information provided by the Company to governmental bodies or the public and the independent audit thereof;

b. the Company's system of internal controls regarding finance, accounting (including valuation policies) and regulatory compliance;

c. the material aspects of the Company's accounting and financial reporting process generally;

d. the independence, qualifications and performance of the Company's independent registered public accounting firm ("independent auditors"), including the lead audit partner;

e. the compliance by the Company with legal and regulatory requirements, including the Company's disclosures and procedures; and

f. the performance of the Company's internal audit function.

77.      The Audit Committee then sets out these specific duties and responsibilities:

To carry out its purposes, the responsibilities of the Committee shall be as follows:

i. Maintain open communications with the independent auditors, internal auditors or other personnel responsible for the internal audit function (if applicable), outside valuation experts, executive management and the Board.

ii. Meet separately, from time to time, with management, internal auditors or other personnel responsible for the internal audit function (if applicable), and the independent auditors to discuss matters warranting attention by the Committee.

iii. Regularly report Committee actions to the Board and make recommendations as the Committee deems appropriate.

iv. Review the financial results presented in all reports filed with the Securities and Exchange Commission ("SEC").

v. Review reports issued by regulatory examinations and consider the results of those reviews to determine if any findings could have a material effect on the Company's financial statements or its internal controls and procedures.

vi. Discuss the Company's disclosure, oversight of and conformity with the Company's Code of Business Conduct and Code of Ethics, and matters that may have a material effect on the Company's financial statements, operations, compliance policies and programs.

vii. Oversee the Company's cybersecurity and other IT risks, controls and procedures, including the Company's plans to mitigate cybersecurity risks and to respond to and potentially disclose cyber incidents.

viii. Issue for public disclosure by the Audit Committee the report required by the SEC to be included in the Company's annual proxy statement.

ix. Review and reassess the adequacy of the Committee's Charter at least annually and recommend any changes to the full Board of Directors.

x. Take other actions required of the Committee by law, applicable regulations or as requested by the Board.

78.     With respect to "Responsibilities for Reviewing the Annual External Audit and the Annual and Quarterly Financial Statements," the Audit Committee Charter states:

The Committee will:

i. Review and discuss with management significant risks and exposures identified by management and the policies, guidelines and processes by which management assesses and manages these risks, including management's steps to minimize them.

ii. Review and discuss with management the presentation of non-GAAP information and the appropriateness and usefulness of such information, as well as compliance with applicable SEC rules and regulations (e.g., Regulation G, Item 10(e) of Regulation S-K).

iii. Review the scope of the external audit with the independent auditors.

iv. Review with management and the independent auditors, as appropriate:

(A) the Company's internal controls;
(B) the Company's significant accounting policies;
(C) the Company's valuation policies and procedures;
(D) the Company's annual audited financial statements and quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," earnings releases before they are made public, as well as financial information and earnings guidance provided to analysts and rating agencies;
(E) all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors; and
(F) material written communications between the independent auditors and management, such as any management letter, management representation letter or schedule of unadjusted differences.

v. Review any significant deficiencies in the design or operation of internal control over financial reporting or material weaknesses therein.

vi. Review and investigate any fraud involving management or other employees.

vii. Review with the independent auditor any audit problems or difficulties and management's response.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

79.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

80.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

81.    Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during the times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

82.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

83.    At the time this suit was filed, the Company's Board was comprised of ten (10) members, consisting of the Director Defendants. Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

### THE DIRECTOR DEFENDANTS ARE
### NOT INDEPENDENT OR DISINTERESTED

84.    As an initial point, the Company concedes on its website that a majority of the

Director Defendants lack independence. Indeed, as shown below, the Company's investor relations webpage notes divides the Director Defendants into "Independent Directors" and "Interested Directors," with six (6) of the Director Defendants being "Interested":



# Interested Directors

| | |
|---|---|
| **Doug Ostrover**  Co-Chief Executive Officer | ⌄ |
| **Marc Lipschultz**  Co-Chief Executive Officer | ⌄ |
| **Craig W. Packer**  Co-President | ⌄ |
| **Michael Rees**  Co-President | ⌄ |
| **Marc Zahr**  Co-President | ⌄ |
| **Jennifer Brouse**  Managing Director | ⌄ |



# Independent Directors

| | |
|---|---|
| **Claudia Holz** | ⌄ |
| **Stacy Polley** | ⌄ |
| **Andrew S. Komaroff** | ⌄ |
| **Dana Weeks** | ⌄ |

85.     Accordingly, for this reason alone, demand is excused as futile because a majority of the Board cannot independently consider a demand to sue.

86.     Nevertheless, the Director Defendants also lack independence for the following reasons.

**The Director Defendants Each Face a Substantial Likelihood of Liability**

87.     Each of the Director Defendants face a likelihood of liability in this action because

they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

88.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

89.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

90.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

91.    As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

92.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

93.    Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

94.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

95.    Further, the Director Defendants authorized the harmful share repurchase program and caused the Company to repurchase its own common stock at artificially inflated prices, thereby causing the Company to overpay for its own stock. As such, the Director Defendants face a substantial likelihood of liability therefor and are incapable of independently considering a demand in the best interests of the Company.

96.    Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**Defendants Ostrover and Lipschultz**

97.    Defendants Ostrover and Lipschultz are neither disinterested nor independent and is thus incapable of considering a demand to sue because they (as Co-CEOs) are employees of the Company who derive substantially all of their income from their employment with the Company, making them not independent.  As such, Defendants Ostrover and Lipschultz cannot independently consider any demand to sue themselves for breaching his fiduciary duties to the Company, because that would expose them to liability and threaten their livelihoods.

98.    As Co-CEOs, Defendants Ostrover and Lipschultz also fail the Nasdaq bright-line independence test as set forth in Nasdaq Listing Rule 5605(a)(2) and cannot, therefore, be considered independent. As such, Defendants Ostrover and Lipschultz could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendants Ostrover and Lipschultz is therefore futile.

99.    Defendants Ostrover and Lipschultz also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as the main perpetrators of the wrongdoing alleged herein, Defendants Ostrover and Lipschultz are irreconcilably conflicted, face a substantial likelihood of liability, and cannot consider a demand to sue.

100.    In addition, Defendants Ostrover and Lipschultz receive lucrative compensation in connection with their employment with the Company. Defendants Ostrover and Lipschultz are not independent from the directors serving on the Compensation Committee as they are responsible for evaluating and determining the compensation of the Co-CEOs and Executive Officers. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its Co-CEOs and Executive Officers. Because of their status as inside directors, and the concomitant substantial compensation they

receive, Defendants Ostrover and Lipschultz could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for their financial future.

101.    Because of Defendants Ostrover's and Lipschultz's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants Ostrover and Lipschultz are unable to comply with their fiduciary duties and prosecute this action. Defendants Ostrover and Lipschultz are in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the Securities Class Action.

**Defendants Packer, Rees, Zahr, and Brouse**

102.    Similar to Defendants Ostrover and Lipschultz, *supra*, Defendants Packer, Rees, Zahr, and Brouse each lack independence because they are employees of the Company who derive substantially all of their income from their employment with the Company, making them not independent.  As such, Defendants Packer, Rees, Zahr, and Brouse cannot independently consider any demand to sue themselves for breaching his fiduciary duties to the Company, because that would expose them to liability and threaten their livelihoods.

**Defendants Holz, Polley, Weeks**

103.    At all relevant times, Defendants Holz, Polley, and Weeks served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia,* overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

104.    Defendants Holz, Polley, and Weeks breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Holz, Polley, and Weeks face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**<u>Additional Reasons Demand is Futile</u>**

105.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

106.    The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

107.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste

of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

108.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

109.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

110.    Publicly traded companies, such as Blue Owl, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company

to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

111.    Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duties)

112.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

113.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

114.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

115.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported information.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

116.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

117.    As a direct and proximate result of the Individual Defendants' breach of their

fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**SECOND CAUSE OF ACTION**

**(Against the Individual Defendants for Gross Mismanagement)**

118.    Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

119.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

120.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

121.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

122.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and

ongoing harm to the Company.

124.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

125.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### (Against the Individual Defendants for Unjust Enrichment)

126.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

128.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

129.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including

any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## FIFTH CAUSE OF ACTION

### (Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act)

130.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

131.    The Individual Defendants disseminated and/or approved public statements that failed to disclose the above-referenced truthful facts and, as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants.  Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

132.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Blue Owl, their control over, and/or receipt and/or modification of Blue Owl's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Blue Owl, participated in the fraudulent scheme alleged herein.

133. The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

134. The Individual Defendants were each members of Blue Owl's Board of Directors and senior management team during the aforesaid time period. Based on their roles at Blue Owl, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

135. At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at Blue Owl, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements.

136. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

137.    As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

138.    As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of their breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of Section 10(b) of the Exchange Act;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein, including but not limited to removing and replacing its officers and directors;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Awarding such other and further relief as is just and equitable.

**<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 19, 2026

          **GAINEY McKENNA & EGLESTON**

          */s/ Gregory M. Egleston*
          Gregory M. Egleston
          Thomas J. McKenna
          260 Madison Ave., 22nd Floor
          New York, NY 10016
          Tel: (212) 983-1300
          Fax: (212) 983-0383
          Email: tjmckenna@gme-law.com
          Email: gegleston@gme-law.com

          ***Attorneys for Plaintiff***

**VERIFICATION**

I, EDWIN MUNIZ, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Blue Owl Capital, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Blue Owl Capital, Inc. common stock at all relevant times.

Edwin Muniz

———————————————————

EDWIN MUNIZ